1:26-mj-3197-RJS

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A COMPLAINT AND ARREST WARRANT**

I, Robert J. Springer, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Affiant is a Special Agent of the United States Department of Agriculture, Office of the Inspector General (USDA-OIG). The facts in this affidavit come from my personal observations; my training and experience; information received from other law enforcement personnel; reports and briefings from state and local agencies; surveillance logs detailing physical activities, meeting sites, and vehicles used by individuals identified in this investigation; bank records and other transaction records; and information received from cooperating witnesses.

2. Because this complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

3. Based on the facts set forth in this Affidavit, there is probable cause to believe that BALIGH NAJI has committed violations of Title 7, United States Code, Section 2024 (Food Stamp Fraud); Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire Fraud).

## PROBABLE CAUSE

**Background**

4. Business 1 was a business located in Euclid, Ohio, that operated as both a gas station and convenience store. The convenience store sold taxable items including beer, wine, gas, lottery tickets, and cigarettes. Business 1 also sold a small selection of non-taxable food items including milk, chips, and small grocery items. Business 1 was authorized by the United States Department of Agriculture, Food and Nutrition Service (USDA-FNS)[1] to redeem food stamp benefits beginning in 2016.

5. The food stamp benefits at Business 1 were processed through electronic banking transactions with third-party processors at the respective stores.

6. Conspirators 1 through 6 were employees of Business 1 and worked behind the counter as a clerk. BALIGH NAJI is identified herein as Conspirator 4.

7. As of October 1, 2008, the official name of the federal Food Stamp Program changed to the Supplemental Nutrition Assistance Program (SNAP). Most people continue to refer to the program and related benefits as the Food Stamp Program and food stamp benefits respectively, and for purposes of this affidavit I will use those terms. The Ohio Electronic Benefits Transfer ("EBT") system is operated through a contract between the USDA-FNS and the State of Ohio. The State of Ohio maintains a primary service contract with Conduent to process EBT accounts. Conduent's primary data center is located in Sandy, Utah. Authorized stores utilize Point of Sale ("POS") electronic card-reading devices to process transactions for SNAP/Food Stamp customers actually purchasing authorized SNAP/Food Stamp Program

[1] On April 30, 2026, the United States Department of Agriculture, Food and Nutrition Service (USDA-FNS) was renamed the United States Department of Agriculture, Food and Nutrition Administration (USDA-FNA).

grocery items. Approved recipients of SNAP benefits are issued Ohio Direction Cards, which function as an EBT or debit cards that they use to spend the funds that have been transferred to the accounts associated with the cards. When recipients use their Ohio Direction Cards at a retailer through a POS device, the EBT system electronically debits the Ohio Direction Card and credits the retail food store bank account each time a customer uses the Direction Card to make a purchase at an EBT authorized store, by use of interstate wires.

8. The Food Stamp Program is a governmental program administered by the USDA through the Food and Nutrition Service in each state. Food stamp benefits are similar to United States currency in that food stamp recipients can purchase food from authorized retailers at the face value of the food stamp benefit. Under 7 CFR § 274.7, food stamp benefits may be used only by the eligible household, or other persons the household selects, to purchase eligible food for the household. Food stamp benefits are obligations of the United States pursuant to 7 U.S.C. § 2024(d).

9. Retail stores may participate in the Food Stamp Program only with the authorization of the USDA-FNS. Most people continue to refer to the department as USDA-FNS and many of the forms and approvals have not been updated to USDA-FNA. For purposes of this affidavit I will refer to the department as USDA-FNS.

10. Authorized participants in the Food Stamp Program may only accept and redeem food stamp benefits in connection with the sale of eligible food stamp items; they are not authorized to accept food stamps benefits from other retailers, nor may they exchange food stamps benefits for cash or other non-food items such as cigarettes, calling cards, cleaning products, medicine, prescription medication, and narcotics, among other items. Federal law specifies that a purchase made using food stamps benefits must be tax exempt. Additionally,

food stamp benefits are for the personal consumption of the intended recipients or their households and are not permitted to be used for commercial uses. Food stamp benefits cannot be used to pay for credit and goods must be exchanged at the time the food stamp benefits are used.

11. The Food Stamp Program in Cuyahoga County, Ohio was converted to electronic benefits in 1997 and made food stamp benefits available to individual recipients via the Ohio Direction Card. Each authorized food stamp recipient is issued an Ohio Direction EBT card that contains a unique account number and an encrypted personal identification number ("PIN"). EBT/Food Stamp benefits are downloaded monthly to the individual EBT Ohio Direction cards. The EBT card is an access device within the meaning of 18 U.S.C. § 1029(e)(1), in that it is a card containing a series of numbers which can be used to obtain things of value, specifically, eligible food items under the Food Stamp Act.

12. At the EBT processor's daily Automated Clearing House ("ACH") cut-off time, the EBT system calculates a settlement amount due to each EBT-only retailer for the value of transactions (net credit and debit activity) performed during the retailer's business day that ended during the ACH day. For non-EBT only retailers the EBT processor also settles to each Third-Party Processor ("TPP")/gateway for all transactions performed for the State's EBT cardholders during the processor's ACH day. These payments represent redemptions from multiple FNS authorized retailers located both inside and outside the State of Ohio. The TPP/gateway, in turn, settles to the individual retailers and banks according to the timeframes specified in their individual agreements. The settlement totals due to each of the above parties, are written to one or more ACH files. The EBT processor transmits the ACH files to their concentrator bank for processing through the Federal Reserve Bank Richmond's ("FRB") ACH system. FRB

processes credits to retailer and TPP bank accounts and simultaneously debits the settlement account.

13. Prospective retailers seeking authorization to process SNAP benefits are required to complete an application process where they are required to complete federal form FNS-252, "Supplemental Nutrition Assistance Program Application for Stores," formerly "Food Stamp Application for Stores." Prospective retailers are required to sign a certification that they understand the rules and regulations of the SNAP program and take responsibility for any violations. Prospective retailers may also be required to provide identification, licensure, purchase agreements, and other business document to prove the legitimacy of the business.

14. At times, to investigate fraud in the SNAP Program, investigators use Controlled EBT cards, which look like regularly-issued Ohio Direction EBT cards but display the name of a fictional individual on the front. The cards are funded in the same way as regularly issued Ohio Direction EBT cards. Because USDA-OIG and the Ohio Department of Public Safety – Investigative Unit ("ODPS-IU") control the cards, investigators are able to monitor where the cards are used and the transaction information. The transaction information includes date, time, amount, and whether the transaction was completed manually or swiped. Generally speaking, if a transaction shows that a card is *swiped*, the card must be present to complete the transaction. If a transaction shows that it was *manually entered*, the card does not necessarily need to be present. A manual transaction can be completed by inputting the full card number and assigned PIN into an EBT terminal. Investigators used Controlled EBT cards in this investigation, and various Controlled EBT cards used in this investigation will be referred to herein as Card 1 through Card 11.

**The Fraudulent Controlled EBT Card Transactions and Sales**

15. From in or around January 2022 through in or around December 2024, NAJI and others engaged in a fraudulent scheme to illegally accept food stamp benefits in exchange for cash and unauthorized items, including beer, cigarettes, cash, and marijuana. NAJI and others often paid cash to obtain cards, including Controlled EBT cards, and then used the fraudulently-obtained SNAP benefits to make numerous transactions at Business 1 and other retailers to purchase SNAP-eligible items at grocery stores, convenience stores, and warehouse clubs in Michigan and Ohio, including purchasing in bulk items typical of those sold in convenience stores like Business 1.

February 2022

16. On February 2, 2022, CW-1 met with Conspirator 1, Conspirator 2, and Conspirator 3 at Business 1. CW-1 exchanged two controlled USDA-OIG EBT cards, Card 1 Card 2, and PINs for those cards for $400. Both Card 1 and Card 2 were swiped through the third-party processing terminal inside the store to confirm the balances. Conspirator 2 provided some of the cash for the cards from his wallet. CW-1 left Card 1 and Card 2 with Conspirator 1, Conspirator 2, and Conspirator 3 at Business 1.

17. On February 4, 2022, CW-1 met with Conspirator 1 and Conspirator 3 at Business 1 and retrieved Card 1. CW-1 sold Card 3 and its PIN, with a balance of $486.33, for $200 and a can of beer. Conspirator 1 paid CW-1 cash from his jacket pocket and Conspirator 3 took possession of the card. Conspirator 3 completed a transaction in the amount of $0.01 through the third-party processing terminal inside Business 1 to confirm the balance. CW-1 left Card 2 with Conspirator 3 at the store.

18. On February 10, 2022, CW-1 met with Conspirator 1, Conspirator 3, and Conspirator 2 at Business 1 and retrieved Card 2 and Card 3. Conspirator 2 returned Card 2 and Conspirator 3 returned Card 3.

19. In February 2022, without CW-1 present, the controlled cards were used to make approximately $1,468.86 in SNAP transactions at Business 1 and other retailers.

March 2022

20. On March 22, 2022, CW-1 met with Conspirator 1 and Conspirator 3 at Business 1. CW-1 gave Card 1 and its PIN to Conspirator 1 in exchange for $200. Conspirator 1 paid CW-1 with cash from his pants pocket. CW-1 left Card 1 with Conspirator 1 at the store.

21. On March 24, 2022, CW-1 met with Conspirator 1 at Business 1 and retrieved Card 1.

22. In March 2022, without CW-1 present, Card 1 was used to make approximately $489.47 in SNAP transactions at Business 1 and other retailers.

February 2023

23. On February 23, 2023, CW-1 met with Conspirator 2 at Business 1 and exchanged Card 4 and its PIN for $100. Conspirator 2 swiped Card 4 five times through the third-party processing terminal inside Business 1 to deplete the balance and returned Card 4 to CW-1. Conspirator 2 deducted a total of $359.22 in SNAP benefits from Card 4.

24. On February 24, 2023, CW-1 received a call from Conspirator 2 from a phone known to belong to Conspirator 2 ("Conspirator 2's cell phone"). CW-1 spoke to Conspirator 2 and an unknown male on the phone. Conspirator 2 and the unknown male told CW-1 to come to the store. The unknown male told CW-1 "we have to refund the money to your card. I don't want to get in trouble by the government." The unknown male told CW-1 "a lot of people lost

their businesses because of this." The unknown male instructed CW-1 to take a picture of the food stamp card and they are going to refund the money.

25. Several minutes later, CW-1 received a call from Conspirator 3 on Conspirator 2's cell phone. She told CW-1 "he gonna refund the money and he gonna take the card and spend it at another store."

26. Affiant knows from his training and experience that store owners and employees who commit food stamp fraud are aware that multiple consecutive transactions using the same SNAP card and/or high-dollar SNAP transactions at convenience stores (where the selection of SNAP-eligible items for purchase is relatively limited) are likely to draw the attention of law enforcement.

April 2023

27. On April 7, 2023, CW-1 met with Conspirator 2 at Business 1 and provided him with three additional controlled EBT cards—Card 4, Card 5, and Card 6—and their PINs. Conspirator 2 paid CW-1 $460 for Card 2 and the three additional controlled EBT cards and told CW-1 he would give CW-1 more money at a later date.

28. On April 11, 2023, CW-1 met with Conspirator 2 and Conspirator 1 at Business 1. CW-1 retrieved Card 2, Card 4, Card 5 and Card 6. Conspirator 2 paid CW-1 an additional $149 from his wallet. Conspirator 2 and Conspirator 1 commented that other people are selling them their cards cheaper than CW-1.

29. In April 2023, without CW-1 present, the controlled cards were used to make approximately $1,965.23 in SNAP transactions at Business 1 and other retailers.

May 2023

30. On May 4, 2023, CW-1 met with Conspirator 2 at Business 1. CW-1 provided Conspirator 2 Card 2 and Card 7 and their PINs, and Conspirator 2 agreed to pay CW-1 $400.00 at a later date.

31. On May 5, 2023, CW-1 met with Conspirator 2 at Business 1. Conspirator 2 gave CW-1 $400 and Card 7. CW-1 told Conspirator 2 they get the cards from "crackheads."

32. On May 14, 2023, Conspirator 2 called CW-1 from another number. Conspirator 2 told CW-1 he needed two more cards.

33. On May 16, 2023, CW-1 met with Conspirator 1 at Business 1 and provided him with Card 4 and Card 5 and their PINs. Conspirator 1 paid CW-1 $80 and agreed to pay additional money when CW-1 picked up the cards.

34. On May 19, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $170 for Card 4 and Card 5, which CW-1 had previously given him on May 16, 2024. Conspirator 1 kept Card 4 and Card 5. Conspirator 1 also agreed to buy Card 2, which CW-1 had given to Conspirator 2 on May 4, 2023. Conspirator 1 agreed to pay CW-1 for the food stamp benefits for all three controlled EBT cards when they were loaded in June.

35. In May 2023, without CW-1 present, the controlled cards were used to make approximately $1,664.49 in SNAP transactions at Business 1 and other retailers.

June 2023

36. On June 7, 2023, CW-1 met with Conspirator 2, Conspirator 1, Conspirator 6, Conspirator 5, and an unidentified male at Business 1. Conspirator 1 told CW-1 he had Card 2, Card 4, and Card 5 in his pocket. CW-1 brought four cards to the store: Card 1, and three additional controlled cards (Cards 8 through 10). An unidentified male reviewed the cards purchased with Conspirator 1 and CW-1. The unidentified male paid CW-1 $500, Conspirator 2

paid CW-1 $100 and Conspirator 1 paid CW-1 $250 for Cards 1, 2, 4, 5, 9, and 10. Card 8 was not purchased during the meeting.

37. On June 14, 2023, CW-1 met with Conspirator 1 and Conspirator 2 at Business 1. Conspirator 1 paid CW-1 $400, consisting of $200 from the cash register and $200 from his pocket. Conspirator 1 returned Card 1, Card 2, Card 4, Card 5 and Card 10 to CW-1. Conspirator 2 told CW-1 he left Card 9 at his house.

38. On June 28, 2023, Conspirator 1 texted CW-1 from Conspirator 1's cell phone. Conspirator 1 requested more cards from CW-1 valued at $2,000.

39. In June 2023, without CW-1 present, controlled cards were used to make approximately $3,424.85 in SNAP transactions from Business 1 and other retailers.

<u>July 2023</u>

40. On July 6, 2023, CW-1 met with Conspirator 1 and Conspirator 2 at Business 1. CW-1 gave Conspirator 1 Card 1, Card 2, Card 7 and Card 8 and PINs. Conspirator 1 paid CW-1 $600 for the five cards and agreed to pay an additional $400 at a later date.

41. On July 13, 2023, CW-1 met with Conspirator 1 and Conspirator 2 at Business 1. Conspirator 1 paid CW-1 $400 and Conspirator 2 handed CW-1 $20 for a total of $420 for the five cards. Conspirator 1 asked CW-1 if he could keep the cards and pay CW-1 the same amount next month. CW-1 agreed to allow Conspirator 1 to keep the cards and receive $1,000 in August. Conspirator 1 told CW-1 "I sell them to our people, to him [motioned to Conspirator 2], to other people in the other gas station, and I have other people to send it the families the numbers manual and shit. They be swiping in Michigan."

42. In July 2023, without CW-1 present, the controlled cards were used to make approximately $2,888.33 in SNAP transactions from Business 1 and other retailers.

August 2023

43. On August 3, 2023, CW-1 met with Conspirator 1 at Business 1. CW-1 had previously sold Conspirator 1 Card 1, Card 2, Card 7, Card 8 and Card 9 and agreed to sell them to Conspirator 1 monthly. CW-1 also brought Card 11 to the meeting. Conspirator 1 paid CW-1 $700 for the six cards. Conspirator 1 agreed to pay CW-1 an additional $450 and an ounce of marijuana on August 4, 2023.

44. On August 4, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $400 from his wallet and gave CW-1 a bag of suspected marijuana. Conspirator 1 gave CW-1 a set of car keys and directed CW-1 to retrieve the bag of suspected marijuana from a black Dodge Durango that was parked near the store. Conspirator 1 maintained possession of the six cards.

45. Investigators determined that the black Dodge Durango was registered to Conspirator 1 ("Conspirator 1's Durango").

46. In August 2023, without CW-1 present, the controlled cards were used to make approximately $4,142.77 in SNAP transactions at Business 1 and other retailers.

September 2023

47. On September 6, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $1,000 and agreed to give CW-1 one and a half ounces of marijuana at a later date when he returned from Michigan for Card 1, Card 2, Card 7, Card 8, Card 9 and Card 11. Conspirator 1 maintained the cards from the previous month.

48. On September 12, 2023, CW-1 met with Conspirator 1 at Business 1 and retrieved a white package containing suspected marijuana in exchange for the six controlled EBT cards Conspirator 1 kept from the month before.

49. In September 2023, without CW-1 present, the controlled cards were used to make approximately $4,148.16 in SNAP transactions at Business 1 and other retailers.

<u>October 2023</u>

50. On October 5, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 agreed to pay CW-1 $850 and two ounces of marijuana for the six controlled EBT cards.

51. Conspirator 1 paid CW-1 $100 and told CW-1 he would give CW-1 the remaining $750 and marijuana when he returned from Michigan.

52. On October 13, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $700 from his wallet along with a bag of suspected marijuana. Conspirator 1 gave CW-1 his car keys and directed CW-1 to Conspirator 1's Durango, which was parked near the store.

53. October 20, 2023, CW-1 returned to the store and met Conspirator 1 outside the store. Conspirator 1 handed CW-1 $125 that was owed to CW-1 for the six controlled EBT cards previously sold to Conspirator 1.

54. In October 2023, without CW-1 present, the controlled cards were used to make approximately $4,170.84 in SNAP transactions at Business 1 and other retailers.

<u>November 2023</u>

55. On November 3, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $500 and a package of suspected marijuana for the six controlled EBT cards. Conspirator 1 told CW-1 to return later in the month for additional money and marijuana for cards.

56. On November 17, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 provided CW-1 with $250 and CW-1 retrieved a package of suspected marijuana at Conspirator 1's direction from Conspirator 1's Durango that was parked near the store. During

the meeting CW-1 asked Conspirator 1 if he could get Viagra. Conspirator 1 told CW-1 he knows people that sell them and will get them for CW-1.

57. In November 2023, without CW-1 present, the controlled cards were used to make approximately $4.136.86 in SNAP transactions at Business 1 and other retailers.

December 2023

58. On December 6, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 provided CW-1 a pill bottle containing 49 suspected Viagra pills and instructed CW-1 he would pay additional money at a later date for the benefits on six controlled EBT cards for December 2023. On December 12, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $250 and told CW-1 to return on a later date for additional money for the six controlled EBT cards for December 2023.

59. On December 15, 2023, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 an additional $400 for the six controlled EBT cards for December 2023.

60. In December 2023, the controlled cards were used to make approximately $4,017.12 in SNAP transactions at Business 1 and other retailers.

January 2024

61. On January 5, 2024, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $100 for the food stamp benefits for six controlled EBT cards for January 2024. Conspirator 1 told CW-1 to return at a later date to pick up additional money.

62. On January 8, 2024, at approximately 9:42 AM, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $100 and told CW-1 to return later to pick up the rest of the money.

63. On January 8, 2024, at approximately 3:43 PM, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 an additional $500 for the food stamp benefits on the six controlled EBT cards.

64. In January 2024, without CW-1 present, the controlled cards were used to make approximately $4,024.96 in SNAP transactions at Business 1 and other retailers.

<u>February 2024</u>

65. On February 7, 2024, CW-1 called Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 agreed to pay $700 for the benefits for the six controlled EBT cards for February 2024. CW-1 told Conspirator 1 that someone else would be picking up the money; that individual was CW-2.

66. On February 12, 2024, CW-2 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-2 $700 as agreed during the February 7, 2024, phone call with CW-1.

67. In February 2024, without CW-1 present, the controlled cards were used to make approximately $3.409.44 in SNAP transactions at Business 1 and other retailers.

<u>April 2024</u>

68. On April 11, 2024, CW-1 received a call from Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1 "the card [D.D.], I have it lost." D.D. corresponds to the initials of the fictional name on the face of Card 1. CW-1 told Conspirator 1 that CW-1 would order up another card. Conspirator 1 told CW-1 Card 9 hadn't been loaded in three months. Conspirator 1 told CW-1 he was in Michigan but arranged for CW-1 to meet with "the cook" at Business 1 on the 15th to retrieve $700 for the April 2024 benefits on the controlled EBT cards.

69. On April 15, 2024, CW-1 met with NAJI (Conspirator 4), Conspirator 6, Conspirator 3 and another employee at Business 1. During the meeting, Conspirator 6 asked CW-1 if the cost of the card was $700. Conspirator 6 instructed CW-1 to come back at 2:30 PM

because another employee was coming then and he was going to the bank to get money. Conspirator 6 told CW-1 that one of the cards was not working. Conspirator 3 told CW-1 they also lost one of the cards. CW-1 was paid $700 cash for the cards. The $700 consisted of $200 Conspirator 3 withdrew from the ATM inside Business 1, $400 from NAJI, and $100 from the other employee.

70. In April 2024, without CW-1 present, the controlled cards were used to make approximately $2,785.48 in SNAP transactions at Business 1 and other retailers.

<u>May 2024</u>

71. On May 7, 2024, at approximately 9:05 AM, CW-1 called Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1 "the black girl, she got she got a $500 one I think, uh, [D.D.], she lost it. And I have the [C.S.] …$420, they both lost…can I get a card with the girl, please." D.D. are the initials of the fictional name on Card 1, and C.S. are the initials of the fictional name on Card 9.

72. On May 7, 2024, at approximately 9:51 AM, CW-1 called Conspirator 1 on Conspirator 1's cell phone. CW-1 told Conspirator 1 "I got one card with, uh, $2400 on it and I got another, another with $400." Conspirator 1 told CW-1 "the $2400 I don't need it, give me the $400. I lost, I lost the $500 and this replace, this it."

73. On May 8, 2024, CW-1 received a call from Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1 "go to, uh, the gas station…same guy, his name NAJI…he gonna give you $200 and give him the card…the one is lost." Conspirator 1 told CW-1 he will have the rest of the money on the 15th or 16th.

74. On May 9, 2024, CW-1 met with NAJI and Conspirator 6 at Business 1. CW-1 gave NAJI Card 12 and its PIN, loaded with $455 in benefits. NAJI had Conspirator 6 swiped

Card 12 and entered the PIN into the terminal inside the store to check the balance. NAJI handed CW-1 $200 from his pocket.

75. On May 16, 2024, Conspirator 1 called CW-1 from Conspirator 1's cell phone. Conspirator 1 told CW-1 he will give CW-1 $300 today and an additional $200 at a later date for the six controlled EBT cards loaded for May 2024. CW-1 told Conspirator 1 they were heading to the store in about an hour. Conspirator 1 told CW-1 he was going to introduce CW-1 to someone else to buy cards.

76. On May 16, 2024, CW-1 met with NAJI at Business 1. NAJI paid CW-1 $300 for food stamp benefits for May 2024 loaded onto controlled EBT cards. On May 21, 2024, CW-1 received a call from Conspirator 5 from a number known to be used by Conspirator 5 ("Conspirator 5's cell phone)." Conspirator 5 told CW-1 he was Conspirator 1's cousin and was looking to buy cards. Conspirator 5 told CW-1 "whatever you got, I got you, bro."

77. On May 29, 2024, CW-1 received a call from Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1, "you gonna go to the store, go to the same guy, he's gonna give you $200."

78. On May 29, 2024, CW-1 met with Conspirator 6 and NAJI at Business 1. NAJI paid CW-1 $200 for food stamp benefits loaded onto the controlled EBT cards for May 2024.

79. On May 29, 2024, CW-1 called Conspirator 5 on Conspirator 5's cell phone. CW-1 told Conspirator 5 that CW-1 had one card with $2400.00 and another with $400.00. They planned to meet the following Thursday.

80. In May 2024, without CW-1 present, the controlled cards were used to make approximately $4.002.21 in SNAP transactions at Business 1 and other retailers.

<u>June 2024</u>

81. On June 4, 2024, CW-1 called Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1 he would pay CW-1 Thursday "$350 and $350 next time…same guy you went to last time…Thursday…call me like always…like you call me."

82. On June 5, 2024, CW-1 called Conspirator 5 on Conspirator 5's cell phone. CW-1 told Conspirator 5 they would bring one card the next day. Conspirator 5 told CW-1 "if I'm not there I'm just going to have one of them meet you up there."

83. On June 6, 2024, CW-1 met with Conspirator 6 and NAJI in a parking lot close to Business 1. Conspirator 6 was driving Conspirator 1's Durango and NAJI was in the passenger seat. NAJI handed CW-1 $350 and CW-1 handed NAJI Card 5 for Conspirator 5. CW-1 told NAJI the PIN for Card 5 and NAJI appeared to type the number into the cell phone he was holding. Conspirator 6 asked CW-1 for a $400 or $500 card. CW-1 told Conspirator 6 they would have a card for him the following week.

84. On June 14, 2024, at approximately 2:19 PM, CW-1 called Conspirator 1 on Conspirator 1's cell phone. Conspirator 1 told CW-1 to meet with NAJI, "go to him [NAJI] at 5:30 PM, he's going to be ready" to pick up $350.

85. On June 14, 2024, at approximately 5:42 PM, CW-1 met with Conspirator 6, Conspirator 2 and NAJI in a parking lot close to Business 1. Conspirator 6 was driving Conspirator 1's Durango, Conspirator 2 was in the passenger seat, and NAJI was sitting in the back seat. Conspirator 2 had money in his hand when CW-1 walked up to the car. Conspirator 2 then handed the money to NAJI in the back seat. NAJI then handed CW-1 $350, the same money Conspirator 2 had handed to NAJI. The $350 was for the controlled cards that were loaded with June 2024 food stamp benefits. Conspirator 2 asked CW-1 if they had "a $600 card." (Affiant understands this to mean an EBT card with at least $600 in SNAP benefits on it.)

CW-1 told Conspirator 2 they could probably get one but wanted half the value of the benefits on the card in exchange.



*(Left to Right: NAJI, Conspirator 2, and Conspirator 6 on June 14, 2024)*

86. In June 2024, without CW-1 present, the controlled cards were used to make approximately $3,859.63 in SNAP transactions at Business 1 and other retailers

<u>July 2024</u>

87. On July 12, 2024, CW-1 met with NAJI inside a business near Business 1. NAJI paid CW-1 $300 for the controlled cards. On July 23, 2024, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $400 from his wallet. The $400 was the rest owed for the controlled cards.

88. In July 2024, without CW-1 present, the controlled cards were used to make approximately $3,653.03 in SNAP transactions at Business 1 and other retailers.

<u>August 2024</u>

89. On August 9, 2024, CW-1 met with Conspirator 5 inside of a white Jeep Cherokee in a parking lot near Business 1. Conspirator 5 gave CW-1 $180 and a package of suspected marijuana for Card 5.

90. On August 15, 2024, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 walked out of the storage area of the store to behind the counter. After he returned from behind the counter, he handed CW-1 $700.

91. In August 2024, without CW-1 present, the controlled cards were used to make approximately $4,468.28 in SNAP transactions at Business 1 and other retailers.

<u>September 2024</u>

92. On September 16, 2024, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $500 from his wallet.

93. On September 19, 2024, CW-1 met with Conspirator 1 at Business 1. Conspirator 1 paid CW-1 $100 and a bag of suspected marijuana. Conspirator 1 went into the storage area of the store and brought the marijuana to CW-1. The $100 and marijuana was the rest owed for the controlled cards in September.

94. On September 27, 2024, CW-1 met with Conspirator 5 inside of a green Dodge Charger in a parking lot near Business 1. Conspirator 5 gave CW-1 a package of suspected marijuana for Card 5. Conspirator 5 and CW-1 had the following conversation:

Conspirator 5: "How do you get these cards, man?"
CW-1: "I sell some dope to them and shit and I get 'em. Why, what's up?"
Conspirator 5: "It's with my baby momma, you feel me? If it's bad I don't want, no."
CW-1 "It ain't bad, no."
Conspirator 5: "As long as you getting it and they got consent."
CW-1: "Yeah."
Conspirator 5: "Yeah, that's cool bro...this shit ain't gonna fall back on me, right?"
CW-1: "Nah."
Conspirator 5: "You sure?"

CW-1: "As far as I know, yeah."

95. Minutes later, CW-1 received a call from Conspirator 5 on Conspirator 5's cell phone. Conspirator 5 told CW-1 he is going to give the card back in the next couple days. Conspirator 5 told CW-1, "You telling me it's legal, but I don't think it's legal."

96. In September 2024, without CW-1 present, the controlled cards were used to make approximately $4,544.87 in SNAP transactions at Business 1 and other retailers.

October - December 2024

97. On October 10, 2024, CW-1 received a call from Conspirator 1 on Conspirator 1's cell phone. Conspirator 5 was also on the call. During the call Conspirator 5 said, "we feel like you setting us up." After several minutes Conspirator 5 asked CW-1 "what's the card numbers?" CW-1 told Conspirator 5 and Conspirator 1 that they can keep the cards because CW-1 was "done." Conspirator 5 then stated, "Give us the card numbers and we gonna meet you for the money…let this business keep going…from now on, gonna have to give you cash, no weed."

98. In November 2024, Card 5 was loaded with $600 in SNAP benefits and, without CW-1 present, was used in 66 transactions at Business 1 and other retailers. In December 2024, Card 5 was loaded with $600.00 in SNAP benefits and, without CW-1 present, was used in 35 transactions at Business 1 and other retailers, including a retailer in Michigan.

**Pattern of Fraudulent Redemptions by the Conspirators**

99. As described above, multiple employees of Business 1, including Conspirator 1, Conspirator 2, NAJI, Conspirator 3, Conspirator 6, and Conspirator 5, participated in the fraudulent sale of the controlled cards as described above, and retrieved money and/or cards from various locations within the store at times. During the investigation, CW-1 made repeated

visits to Business 1 to sell cards and retrieve cash, marijuana, Viagra and other unauthorized items from various employees. CW-2 made multiple visits to retrieve cash at Business 1.

100. A review of the use of the Controlled EBT cards described above shows usage patterns that I know from my training and experience to be consistent with fraudulent food stamp redemptions. In particular, after being sold to employees of Business 1 the controlled cards were used to make small-dollar purchases and purchases ending in .00 and .01 at the EBT terminals inside Business 1. Affiant knows from his training and experience that such purchases are consistent with fraudulent transactions, especially given that sales tax is not applied to SNAP purchases and most stores (including Business 1) price items ending in .X9, not in .00 or .01.

101. The use of the Controlled EBT cards appears to be part of a larger pattern in this scheme and conspiracy. For example, a review of other transactions at Business 1 also shows an unusually large number of transactions ending in .00 and .01 being processed on other EBT cards, suggesting that those transactions are also fraudulent, and that the use of the Controlled EBT cards is just a small part of a much larger pattern of food stamp fraud. Between January 2023 and November 2024 there were 38 $.01 transactions, 576 $1.00 transactions, 805 $2.00 transactions and 455 $3.00 transactions.

102. More broadly, Business 1 also processes an unusually large volume of food stamp redemptions. From January 1, 2018, through November 2024, Business 1 redeemed over $1.5 million in food stamp benefits. In comparison, six other gas stations that operate convenience stores within an approximate two-mile radius of Business 1 redeemed an average of approximately $300,000 in food stamp benefits during the same time period. Additionally, Business 1 processed over 179,000 food stamp transactions, while the six other comparator gas

stations processed between 23,000 and 80,000 (with an average of 47,000 food stamp transactions across all six gas stations).

103. Moreover, as shown with the Controlled EBT cards, many of the fraudulent redemptions on those cards were not done at Business 1, suggesting that the redemptions at Business 1 significantly understate the volume of fraudulent redemptions by the members of the conspiracy. Accordingly, the evidence suggests that the members of this conspiracy have likely engaged in at least approximately $1 million in fraud on the SNAP program.

## CONCLUSION

104. Based on the foregoing, I respectfully submit that there is probable cause to believe that BALIGH NAJI committed violations of 7 U.S.C. § 2024 (food stamp fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1349 (conspiracy to commit wire fraud), from in or around January 2022 through at least in or around December 2024, in the Northern District of Ohio, and elsewhere.

Respectfully submitted,

Robert J. Springer
Assistant Special Agent-in-Charge
USDA-OIG

This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per Fed. R. Crim P. 4.1 on this 5th day of October 2026.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO

Reuben J. Sheperd, United States Magistrate Judge